IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA           :

          v.                                   :           CRIMINAL NO. 10-631

BERNADETTE NICHOLAS                 :

GOVERNMENT'S SENTENCING MEMORANDUM

I.     FACTS

          Bernadette Nicholas, an independent mortgage broker and the owner/operator of the Nicholas Mortgage Company, Dennis Nicholas, Bernadette Nicholas' husband and business associate, and Kevin McAllister, a commercial loan officer at Wilmington Trust Federal Savings Bank ("Wilmington Trust"), all engaged in a scheme that caused Wilmington Trust to fund more than $30 million in mortgages to clients of the Nicholas Mortgage Company and led to bribes/kickbacks being paid by the Nicholases to McAllister in return for seeing that the mortgages were funded.  The scheme was accomplished by Bernadette Nicholas packaging mortgage applications and supporting documentation that misrepresented material facts, among other things, the mortgage applicant's income and assets, their FICO scores, and the true source and amount of down payments.  Once mortgage applications and supporting documentation were finalized for presentation to Wilmington Trust, Bernadette Nicholas forged or caused the mortgage applicant's signature to be made on the documents, knowing that the contents of the documents were not true.  The Nicholas Mortgage Company also caused inflated appraisals of the properties to be mortgaged to be submitted to Wilmington Trust, in order to theoretically support the mortgage amounts.  McAllister, who processed all of the loan packages submitted by

Bernadette Nicholas, failed to fulfill his responsibility as a loan officer to Wilmington Trust to scrutinize the mortgage applications and supporting documentation and decline those applications which did not meet Wilmington Trust's criteria because, after Bernadette Nicholas received her mortgage broker's commission at settlement, she and Dennis Nicholas paid McAllister a percentage of each loan that he approved and Wilmington Trust funded.

The motivation for Bernadette Nicholas in furthering the fraud scheme was financial.  She received a mortgage broker's commission equivalent to approximately two to three percent of the total amount of a funded loan at the time of loan settlement.  During the years 2004, 2005, and 2006, Bernadette Nicholas received approximately $1.2 million as the result of the loans funded by Wilmington Trust.  Once these monies were received by Bernadette Nicholas, the checks or monies were deposited into accounts maintained by Dennis Nicholas, who then wrote checks made payable to Kevin McAllister equivalent to approximately one percent of the amount of the funded loan, the latter representing kickbacks/bribes to McAllister for getting the questionable loans approved and funded.

In addition, neither Bernadette Nicholas and Dennis Nicholas, who filed a joint return, nor Kevin McAllister, who filed a joint return with his wife, reported any of the monies that were initially received by the Nicholases and transferred to McAllister on either of their federal income tax returns submitted to the Internal Revenue Service.  The Nicholases jointly filed federal income tax returns based solely on the income that Bernadette Nicolas received from the Nicholas Mortgage Company.  During the tax years 2004, 2005 and 2006, Bernadette Nicholas received approximately $1.2 million in referral fees from Wilmington Trust.  But, in preparation of the information that the Nicholases intended to provide to their accountant, who

finalized and filed their income tax returns, they knowingly failed to provide the accountant with Bernadette Nicholas' actual income.  The Nicholases omitted any monies that they initially received at settlements that they then paid to McAllister, as well as any monies that they used to pay toward their adult children's mortgages, rents, car loans, and several other expenses. McAllister and his wife also filed joint federal income tax returns.  McAllister also did not include a total of $379,075 in kickbacks/bribes that he received from the Nicholases in his reported income between 2004 and 2006.  Accordingly, the financial gains that the Nicholases and McAllister received by the funding of the deficient loans applications presented to McAllister by Bernadette Nicholas were concealed from Wilmington Trust and the Internal Revenue Service.

          Separate and apart from the activities involving Wilmington Trust, Bernadette Nicholas brokered two mortgages for John and Deborah DiSaverio with Malvern Federal Savings Bank ("Malvern Federal").  The purpose of the mortgages was to purchase an apartment building from Wayne Rosen, doing business as ("d/b/a") Sport-Tech Imaging, Inc.  Either Bernadette Nicholas or Dennis Nicholas came up with the sale price of the building.  Neither of the DiSaverios made an effort to negotiate the price, instead they simply followed the directions given to them by Bernadette Nicholas.  Bernadette Nicholas filled out the loan application on behalf of the DiSaverios with false information about their income and altered their income tax return, then submitted the application to Malvern Federal.  Before or at the time of settlement, neither Bernadette Nicholas, Dennis Nicholas, nor Wayne Rosen, who engaged in a teleconference in advance of the settlement and knew all of the particulars as to the terms of the mortgage and the fact that there would not be a down payment but this would not be disclosed to

Malvern Federal, informed Malvern Federal of the false representations made in the loan application or the actual amount of a second mortgage that was part of the sale of the apartment building from Wayne Rosen to the DiSaverios. They fraudulently led Malvern Federal's loan officers to believe that the DiSaverios were making a $440,000 down payment when, in fact, the entire purchase price of the building was being financed. Dennis Nicholas orchestrated the settlement and dictated the false information that would be contained on the settlement sheet. Dennis Nicholas also presented the DiSaverios with a subordination agreement once the settlement was completed and had the DiSaverios agree to pay Rosen $568,000 in a second mortgage, when only minutes prior during the settlement, Malvern Federal was led to believe that the DiSaverios were obtaining a second mortgage of $128,000; by design, this separate agreement also hid the fact that the DiSaverios were not paying a down payment. Thus, Malvern Federal funded a loan to the DiSaverios in the amount of $1,632,000 based on numerous false representations.

        Malvern Federal fell victim to another scheme executed by Bernadette Nicholas, Dennis Nicholas, and Wayne Rosen, when Bernadette Nicholas and Wayne Rosen, d/b/a CINOR, LP, applied for a $3.5 million loan from Malvern Federal to refinance two existing loans for a medical building. The $3.5 million loan was intended to pay off an existing loan that CINOR, LP had at Malvern Federal in the amount of $1,494,823.55 and a $1,583,491.90 loan from Wilmington Trust. In order to facilitate CINOR, LP's ability to obtain the new loan, Bernadette Nicholas, Dennis Nicholas, and Wayne Rosen caused seven bogus leases to be submitted to an appraisal company and Malvern Federal. The leases were purportedly between CINOR, LP and six physicians and Powerweb Technologies, Inc., an energy design and engineering firm, who

-4-

had contracted to rent space in the building and represented to Malvern Federal that CINOR, LP had sufficient rents to meet their monthly mortgage obligation. However, after Malvern Federal funded the $3.5 million loan, it was learned that the leases which CINOR, LP presented to Malvern Federal and which Malvern Federal relied on as cash flow to secure the loan were bogus. Bernadette Nicholas admitted that she forged signatures on the leases and she and Wayne Rosen admitted that they used the bogus leases in order to deceive Malvern Federal and to obtain the requested loans.

Based on the foregoing facts and those set forth in additional detail in the Superseding Indictment, Bernadette Nicholas pled guilty to bank fraud, in violation of 18 U.S.C. § 1344 (Counts 1 and 63); loan application fraud, in violation of 18 U.S.C. § 1014 (Counts 2 through 55, and 64 and 65); bank bribery, in violation of 18 U.S.C. § 215(a)(1) (Count 56); and, filing false and fraudulent income tax returns, in violation of 26 U.S.C. § 7206(1) (Counts 58 and 59).

II.     SENTENCING CALCULATION

        A.     Statutory Maximum Sentence

        18 U.S.C. § 1344 - Bank Fraud - Counts One and Sixty-Three: 30 years imprisonment, five years supervised release, a $1,000,000 fine, and a $100 special assessment for each count.

        18 U.S.C. § 1014 - Loan Application Fraud - Counts Two through Fifty-Five, Sixty-Four, and Sixty-Five: 30 years imprisonment, five years supervised release, a $1,000,000 fine, and a $100 special assessment for each count.

18 U.S.C. § 215 - Bank Bribery - Counts Fifty-Six: 30 years imprisonment, five years supervised release, a $1,000,000 fine, and a $100 special assessment.

26 U.S.C. § 7206(1) - Filing False and Fraudulent Income Tax Return - Counts Fifty-Eight and Fifty-Nine: Three years imprisonment, one year supervised release, a $100,000 fine, and a $100 special assessment for each count.

Total: 1,776 years imprisonment, $59,200,000 fine, five years supervised release, and a $6,100 special assessment.

B.    Sentencing Guidelines

1.    Applicable Sentencing Guidelines Sections

The parties agreed and stipulated to the applicability of the following guideline provisions as part of their plea agreement:

Pursuant to the terms of the guilty plea agreement entered into by the government and Bernadette Nicholas, the parties agreed and stipulated that $2.5 million was the fraud loss caused in furtherance of the criminal activity jointly undertaken by Bernadette Nicholas and her co-schemers in the scheme to defraud Wilmington Trust and the loan application frauds charged in Counts One through Fifty-Five.  Based on this amount, pursuant to U.S.S.G. §§ 1B1.3 and 2B1.1(a) and (b)(1)(I), the total offense level is 23.

The parties agreed and stipulated that more than $1 million, but less than $2.5 million was the fraud loss caused in furtherance of the criminal activity jointly undertaken by Bernadette Nicholas and her co-schemers in the scheme to defraud Malvern Federal and the loan application frauds charged in Counts Sixty-Three through Sixty-Five.  Based on this amount, it

-6-

was agreed that pursuant to U.S.S.G. §§ 1B1.3 and 2B1.1(a) and (b)(1)(I), the total offense level is 23.

The parties agreed and stipulated the offense level for the bank bribery charge set forth in Count Fifty-Six is governed by U.S.S.G. §§ 2B4.1 and 2B1.1.  The parties further agreed that the base offense level is 8 and 12 additional levels are added because the bribes/kickbacks totaled more than $200,000, but less than $400,000.

The parties agreed and stipulated that the offense level for the tax charges set forth in Counts Fifty-Eight and Fifty-Nine is found in U.S.S.G. §§ 2T1.1(a)(1) and 2T4.1(F).  Based on a tax loss of approximately $56,340, the offense level is 14.  Pursuant to § 2T1.1(b)(1), the Nicholases are eligible for a two level increase due to their failure to report income exceeding $10,000 in any year from criminal activity, bringing the total offense level to 16.

The government believes that Bernadette Nicholas is subject to a two-level enhancement for abuse of trust and use of a special skill.  She was a licensed mortgage broker and abused the public trust and the trust afforded to her by Wilmington Trust and Malvern Federal with respect to the conduct charged in Counts One through Fifty-Five and Counts Sixty-Three and Sixty-Four.  Therefore, pursuant to U.S.S.G. § 3B1.3, two levels are added to the offense level.

2.    Grouping:

Pursuant to §3D1.2, the government believes that Counts One through Fifty-Five and Counts Sixty-Three through Sixty-Five should group for purposes of calculating the total adjusted offense level because the offense level is determined largely on the basis of the total amount of harm or loss and because the criminal conduct was ongoing and continuous in nature.

Count Fifty-Six is then grouped with Counts One through Fifty-Five and Counts Sixty-Three through Sixty-Five pursuant to U.S.S.G. § 3D1.2(c) because Count Fifty-Six embodies conduct that is treated as a specific offense characteristic in, or other adjustment, to the guideline applicable to another of the counts.

The government believes that Counts One through Fifty-Six and Counts Sixty-Three through Sixty-Five may not be grouped with Counts Fifty-Eight and Fifty-Nine.

The government believes that pursuant to U.S.S.G. § 3D1.3(b), in the case of counts grouped together pursuant to U.S.S.G. § 3D1.2(d), the offense level applicable to a group is the offense level corresponding to the aggregated quantity and the offense guideline that produces the highest offense level is applied.  Based on the stipulations agreed upon by the parties, and the addition of two levels for abuse of trust, the two bank fraud counts (Counts One and Sixty-Three) produced the higher offense level at 25.

The government further believes that pursuant to U.S.S.G. § 3D1.4, the adjusted offense level for the tax charges is 16 and, being nine levels less serious than the bank and loan fraud counts, the total offense level is 25.

3.    Adjustments

Bernadette Nicholas accepted responsibility for her criminal conduct and is entitled to a three level reduction in her offense level pursuant to U.S.S.G. §§ 3E1.1(a) and (b).

Total Adjusted Offense Level: 22

4.    Criminal History Category Calculation

Bernadette Nicholas falls into Criminal History Category I.

5.      Applicable Sentencing Range Under the Guidelines

The government believes that based on a total adjusted offense level of 23 and a criminal history category I, Bernadette Nicholas faces a sentencing range between 41 and 51 months imprisonment.  She also faces a fine in the range of $7,500 to $59,200,000 pursuant to U.S.S.G. § 5E1.2(c)(3) and (4).

The United States Probation Office has prepared a Presentence Investigation Report ("PSR") which describes the aforestated counts in greater detail and arrives at different conclusions as to the loss amount.  The government has shared its sentencing calculations with the Probation Office and noted that the government's calculations are based on the stipulations agreed upon by the parties at the time the guilty plea agreement was negotiated and executed and Bernadette Nicholas pled guilty.

III.    SENTENCING ANALYSIS

Following United States v. Booker, 543 U.S. 220 (2005), imposing a sentence under the advisory Guidelines is a multi-step process.  The sentencing court must initially determine, after making appropriate findings of fact, the applicable Guideline range.  The advisory Sentencing Guidelines promote the basic aim of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways."  Booker, 543 U.S. at 252.  In furtherance of that goal, a sentencing court is required to "consider the Guidelines 'sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant,' the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims."  Id. at 260 (citations omitted).

After determining the applicable Guidelines range, the court then considers whether a sentence within that range serves the statutory factors set forth in Section 3553(a) and, if not, select a sentence that does serve those factors. Under the procedure outlined in Gall v. United States, 128 S.Ct. 586, 596-97 (2007), the court must undertake an individualized assessment of the facts of each case in light of the factors delineated in 3553(a). The Supreme Court, however, recognizes that "[t]he sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the [United States Sentencing] Commission or the appeals court." Rita v. United States, 551 U.S. 338, 356 (2007). Accordingly, "while the statute still requires a court to give respectful consideration to the Guidelines, Booker permits the court to tailor the sentence in light of other statutory concerns as well." Kimbrough v. United States, 128 S.Ct. 558, 569-70 (2007) (citations and quotation omitted).

Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner;

Section 3553(a) further directs the Court – in determining the particular sentence to impose – to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the

Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.  See 18 U.S.C. § 3553(a).  The court must select a sentence in light of these factors and all other factors under Section 3553(a), and must adequately explain the rationale for its sentence.  Gall, 128 S.Ct. at 597.  If the sentencing court, after considering all of these factors, chooses to vary outside the advisory Guideline range, such a variance must be supported by a rationale sufficiently compelling to support the extent of the deviation.  Id.

In selecting a sentence outside the advisory Guideline range, the court should first consider whether appropriate grounds for departure exist.  As the government has filed a separate motion containing the government's request for a departure pursuant to U.S.S.G. § 5K1.1.  Notwithstanding the representations made in the government's §5K1.1 motion, as discussed below, the government respectfully submits that application of the sentencing factors to Bernadette Nicholas' conduct, at a minimum, calls for a sentence that would forcefully promote general deterrence against mortgage fraud, bank bribery, and tax fraud.

A.      The Nature and Circumstances of the Offense

The nature and circumstances of the instant offense are unique and especially disturbing.  The length, scope, and sheer number of fraudulent transactions involved in this offense are extraordinary and reveal Bernadette Nicholas' relentless dedication to defrauding banks and loan applicants for her and her husband's personal gain.  The number of fraudulent transactions involved in this offense do not even encompass all of the relevant conduct engaged in by the defendant with Bernadette Nicholas, in that she started giving McAllister kickbacks/bribes during his tenure with his previous employer, Madison Bank.  There was also a

level of secrecy associated with the relationship that Bernadette Nicholas and McAllister had, often meeting at a diner located near McAllister's Wilmington Trust office to get loan application packages and giving him a hand full of the packages to take back to his office, rather than meeting in his office.  Similarly, the kickback/bribe payments were often made discreetly.  The consequential effects on the victim banks and the loan applicants as the result of Bernadette Nicholas' actions cannot be understated; she simply caused far too many loans to be funded when the applications failed to meet Wilmington Trust criteria because the loan applicants did not have any means with which to make payments, lacked sufficient FICO scores, and were being linked to mortgages on properties that had been over-appraised, and the properties were not worth the money.

Bernadette Nicholas was the face of the Nicholas Mortgage Company.  She solicited loan applicants and then packaged their loans in such a way that Kevin McAllister at Wilmington Trust would overlook the worthiness of a loan application because he was getting paid a kickback/bribe for every loan that was funded.  Between 2000 and 2006, Bernadette Nicholas obtained approximately $30,000,000 in loans for her clients, many of which went into mortgage foreclosure, causing losses to Wilmington Trust totaling approximately $2.5 million.  These loans realized fees totaling approximately $1.2 million for Bernadette Nicholas and rewarded Kevin McAllister by Bernadette Nicholas and Dennis Nicholas paying him approximately $380,000.

Bernadette Nicholas also solicited John and Deborah DiSaverio's business and encouraged them to buy the apartment building from Wayne Rosen.  Bernadette Nicholas and Dennis Nicholas worked out the terms of the mortgage from Malvern Federal, but manipulated

-12-

the settlement so that Malvern Federal was unaware of all of the details associated with the mortgage, particularly the fact the DiSaverios were not making a down payment.  The sale of the apartment building realized an $80,000 windfall for Bernadette Nicholas' daughter, Katherine Nicholas, a real estate agent, who had done absolutely nothing to justify the income.  Also, Bernadette Nicholas and Dennis Nicholas also walked from the settlement with a sizable check.

Bernadette Nicholas also realized a benefit by defrauding Malvern Federal when she, Dennis Nicholas, and Wayne Rosen caused bogus leases to be presented to the bank in order to obtain the $3.5 million loan with a cash-out bonus, the latter of which was used exclusively by Bernadette Nicholas and Dennis Nicholas and only in part used to make the monthly mortgage payments after the loan was funded.

Finally, Bernadette Nicholas and Dennis Nicholas defrauded the Internal Revenue Service by selectively choosing which income to report on her federal income tax returns.

Bernadette Nicholas' crimes were serious, long-running, complex, and highly orchestrated.  The crimes harmed individuals who committed to mortgages that were not sustainable and undermined confidence in the mortgage process and the real estate market. Accordingly, the sheer scale of her crimes and the consequent impact on numerous individuals and entities calls for a significant punishment.  While Bernadette Nicholas has conceded that the applicable loss amount for Guidelines purposes is $2.5 million for the Wilmington Trust fraud scheme, between $1 million and $2.5 million for the Malvern Federal fraud scheme, and that the bank bribery involved approximately $380,000, the losses to the financial institutions captures only part of the significance of the defendant's crimes.  These losses only begin to reflect the damage to the financial institutions that lent well over $30 million based on fraudulent loans –

-13-

many of which have gone into foreclosure.  Thus, in sentencing Bernadette Nicholas, a sentence

that reflects the full impact of the defendant's crimes is warranted.

       B.     <u>History and Characteristics of the Defendant</u>

       Bernadette Nicholas has admitted that she provided false information to

Wilmington Trust, Malvern Federal, and the Internal Revenue Service.  She also engaged in

extremely questionable activities while on bail and under a court order that prohibited her from

engaging in any activities with financial accounts other than those in which she was a named

account holder.  She also appears to have been lacking in candor to her current landlord, as

indicated in PSR ¶ 74, note 2.  Furthermore, deposits of thousands of dollars into Bernadette and

Dennis Nicholas' TD Bank, as indicated in PSR ¶¶ 92-98, gives pause as to whether the

defendant is once again engaged in criminal activity and/or obstruction of justice.

       Notwithstanding Bernadette Nicholas' questionable actions, upon learning of the

investigation, she did meet with investigators and, in large part, admitted her criminal conduct.

And, as stated in the government's motion under U.S.S.G. § 5K1.1, the defendant also

cooperated with the government and testified in the grand jury and at the trial of her co-

defendant.

       C.     <u>The Need to Afford Adequate Deterrence</u>

       Under Section 3553(a), the need for the sentence to "afford adequate deterrence to

criminal conduct" must also be considered.  18 U.S.C. § 3553(a)(2)(B).  The enormity and

audacity of these crimes has understandably maintained the attention of the victim banks in this

case.  Thus, the deterrent message and effect of the sentence imposed by the Court in this case

will resonate significantly with any individual or institution tempted to engage in conduct similar

to that of the defendant and her co-defendants.  This need for deterrence is especially important for other mortgage brokers and loan officers, who may operate under the mis-impression that they can operate without scrutiny and avoid significant jail terms.

       D.    <u>The Need to Avoid Unwarranted Sentence Disparities</u>

Under 18 U.S.C. § 3553(a)(7), the Court should consider the "need to avoid unwarranted sentencing disparities."  Here, Bernadette Nicholas is not similarly situated to either of her co-defendants.  As the licensed mortgage broker involved in both of the bank fraud schemes, the bank bribery, and tax fraud, Bernadette Nicholas' Guidelines reflect the gravity of her crimes.  Accordingly, the sentence requested by the Government would not generate a cognizable disparity.

IV.    <u>CONCLUSION</u>

The government submits that Bernadette Nicholas' crimes were unique and extremely serious in light of the length, scope, and the breadth and nature of the offenses. Accordingly, the Court must impose a sentence that reflects this seriousness and the consequent financial devastation wrought by her conduct, will promote respect for the law, and will deter others.  Deterring conduct of this unique nature is particularly important, because fraud of this length, scope, and breadth undermines the trust that is essential to the banking and mortgage industry.  A term of years of imprisonment will forcefully promote general and specific deterrence.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


/s/ Anita Eve
ANITA EVE
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

I certify that a copy of the Government's Sentencing Memorandum has been filed

electronically on the Electronic Case Filing system and is available for viewing and downloading

from the ECF system, and was served by electronic mail on the following defense counsel:


Nicholas J. Nastasi, Sr. Esquire
241 S. 7th Street
Philadelphia, PA 19106
Njn@njnlaw.com



/s/ Anita Eve
ANITA EVE
Assistant United States Attorney



DATED: October 18, 2012